UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THEODORE W. MISLIN, Sr. and
BARBARA A. MISLIN, individually and as
Co-Administrators of the Estate of
Theodore W. Mislin, Jr.,

                                        Plaintiffs,

                v.                                                    **DECISION AND ORDER**
                                                                          02-CV-273S

CITY OF TONAWANDA SCHOOL DISTRICT,
BOARD OF EDUCATION OF CITY OF TONAWANDA
SCHOOL DISTRICT, ANDREW FREEDMAN
and DIANA D. GREENE, individually and in their
official capacities,

                                        Defendants.

## I. INTRODUCTION

Presently before this Court are the defendants' Motions for Summary Judgment.

Defendants City of Tonawanda School District ("School District"), the Board of Education

of the City of Tonawanda School District ("the Board") and Superintendent Diana D.

Greene (collectively the "Tonawanda Defendants") filed a Motion for Summary Judgment

on November 15, 2005.[1]  Defendant Andrew Freedman, who is represented by separate

counsel, also filed a Motion for Summary Judgment on that same date.[2]  After full briefing,

this Court heard oral argument on May 31, 2006, and reserved decision at that time.  For

---

[1]In support of their motion, the Tonawanda Defendants filed a memorandum of law, a Rule 56 Statement of Undisputed Material Facts, the Affidavit of Diana D. Greene, with attached exhibits, the Declaration of Michael P. McClaren, Esq. with attached exhibits, a reply memorandum of law, the Reply Declaration of Michael P. McClaren, Esq., with attached exhibits, and a supplemental memorandum of law.  Plaintiffs filed a joint opposition to both summary judgment motions consisting of a memorandum of law, a Rule 56 Statement of Undisputed Facts, the Affirmation of Andrew Fleming, Esq., with attached exhibits, and a supplemental memorandum of law.

[2]In support of his motion, Freedman filed a memorandum of law, a Rule 56 Statement of Undisputed Facts, the Affidavit of Marylou K. Roshia, Esq., with attached exhibits, a reply memorandum of law, and a supplemental memorandum of law.  Plaintiffs filed a joint opposition as described in footnote 1.

the reasons stated below, the motions are granted as to the federal claims, and this Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.

## II. BACKGROUND

### A.    Facts

Theodore Mislin, Jr. ("Mislin"), a Caucasian male, was a senior at Tonawanda High School during the 2000-2001 school year.   (Plaintiffs' Statement,[3] ¶ 1; Tonawanda Defendants' Statement,[4] ¶¶ 6, 10.)  Green was the Superintendent of the School District. (Plaintiffs' Statement, ¶ 2.)  Patrick J. Slavin was the Principal of Tonawanda High School and Larry Badgley was the Vice-Principal.[5]   (Plaintiffs' Statement, ¶ 2.)

#### 1.    Racial Incidents Involving Tonawanda High School Football Players

Racial tension at Tonawanda High School began to rise during a pep rally held before the Tonawanda-North Tonawanda football game in October of 2000.  (Freedman's Statement,[6] ¶ 5.)  Mislin was a "star athlete" and starter on the football team.  (Freedman's Statement, ¶ 9; Roshia Aff., Exhibit R.)  It is a tradition at Tonawanda High School for the football players who are seniors to give the varsity cheerleaders a rose during the pep rally. (Freedman's Statement, ¶ 5.)  The football players also traditionally pick one cheerleader to tease, usually one of the captains of the squad.  (Freedman's Statement, ¶ 6.)  At the pep rally in October of 2000, however, the football players allegedly yelled "don't give the

---

[3]Referring to Plaintiffs' Rule 56 Statement of Undisputed Facts.

[4]Referring to the Tonawanda Defendants' Rule 56 Statement of Undisputed Facts.

[5]Plaintiffs voluntarily dismissed Patrick J. Slavin and Larry Badgley from this action on September 29, 2003.  (Docket No. 56.)

[6]Referring to Freedman's Rule 56 Statement of Undisputed Facts.

nigger a rose," referring to the only African-American cheerleader.   (Freedman's Statement, ¶ 7.)

In November of 2000, another racially charged incident occurred at a home game for Tonawanda against Lackawanna.   (Freedman's Statement, ¶ 8.)   At the time, Tonawanda High School had few minority students and few minority football players, in contrast to Lackawanna High School, which had many minority students and players. (Freedman's Statement, ¶¶ 10, 11.)  During the game, Tonawanda's players (and some of the fans) directed racial slurs at the visiting Lackawanna team.  (Freedman's Statement, ¶ 11.)

After the football game, Tonawanda High School issued "Deportments" (written reprimands) to Mislin and several other football players based on their behavior during the game.  (Freedman's Statement, ¶ 12.)  No suspensions or other discipline was imposed. (Freedman's Statement, ¶ 12.)

### 2.     Francesca Boykins' Complaints

In November of 2000, Francesca Boykins, an African-American student in her senior year, complained to Slavin and Badgley that Mislin racially harassed her.   (Plaintiffs' Statement, ¶ 3.)   Badgley immediately spoke to Mislin about Boykins' allegations. (Plaintiffs' Statement, ¶ 3.) Shortly thereafter, on November 14, 2000, Badgley and Slavin issued Mislin a Deportment instructing him not to make racial comments in school. (Plaintiffs' Statement, ¶ 3; Fleming Affirm., Exhibit A.)   After Badgley and Slavin's intervention, Boykins again complained that Mislin asked, "Am I offending you?" (Plaintiffs' Statement, ¶ 4.)  Badgley and Slavin spoke with Mislin a second time and advised him to

stay away from Boykins.  (Plaintiffs' Statement, ¶ 4.)  Boykins then complained that Mislin

yelled "N-Bomb" in the hallway, but it was determined that a different student was

responsible.  (Plaintiffs' Statement, ¶ 4.)

Perceiving that Badgley and Slavin were too lenient with Mislin, Boykins sent a

formal complaint to the Board on December 6, 2000.  (Freedman's Statement, ¶ 14;

Tonawanda Defendants' Statement, ¶ 11.)  Therein, Boykins complained that Mislin and

others were "getting away with" making racist and derogatory statements to and about

students in the school.  (Freedman's Statement, ¶ 15.)  Boykins complained that on

November 8, 2000, Mislin, Steve Mosich and Rob Fisher yelled "all the fags should be put

in a camp and killed like the Jews" while standing at their lockers.  (Plaintiffs' Statement,

¶ 5.)  Boykins alleged that three teachers witnessed this event and did nothing about it.

(Plaintiffs' Statement, ¶ 5.)  Boykins also complained about the football players' conduct

at the October 2000 pep rally and during the November 2000 Lackawanna-Tonawanda

football game.  (Plaintiffs' Statement, ¶ 5.)  Boykins' written complaint was as follows:

> I am writing this to express my disgust for the students and
> faculty of Tonawanda Senior High School.  I don't understand
> how anyone can listen to the students of this school make
> racist and derogitory [sic] statements to and about the students
> of this school and let them get away with it.  November 8,
> 2000, before homeroom, Ted Mislin, Steve Mosich and Rob
> Fisher were standing at their lockers, screaming at the top of
> their lungs "All the fags should be put in a camp and killed like
> the Jews."  Three teachers heard them say this, and yet no
> one did anything about it.  My locker is across from theirs and
> I have to listen to this everyday.  Another example of this is in
> the 7th period Senior Study Hall that I am in.  The students
> Ted Mislin, Bryan Strauss, Rachael Burkett and Rich Brumfield
> were talking about the Lackawanna football game.  They all
> kept chanting N-bomb (which means nigger).  Rachael Burkett
> stands up and starts yelling N-bomb and then starts saying

racist remarks about blacks. Three teachers were in the copying room across the hall, heard the whole thing and did nothing about it.

I also don't [sic] understand why none of the football players were disciplined for their behavior at the T-NT Pep Assembly and at the Lackawanna football game. The football players can call an African American Varsity Cheerleader a nigger and get away with it, yet a student can almost get suspended for throwing a roll of toilet paper at an underclassmen [sic]. Maybe if the football players were disciplined for their actions, the incident at the Lackawanna football game would not have happened. If the football players can disrespect members of their own school and community then of course they will disrespect people of another school and community. They seem to think that since they are on the football team everyone should "bow down" to them and they can get away with anything and everything. Someone should tell them that it will not always be that way. They shouldn't be honored, they should be disciplined. I would like it if you were to take some sort of action in our school because these so called authority figures in our school will not do so.

Since I am an African American student, this all offends me and it also offends students who aren't African American.

Sincerely,
Francesca Boykins
A Tonawanda High School Senior

(Roshia Aff., Exhibit H.)

Upon receiving Boykins' complaint, Greene, on behalf of the Board, hired Freedman to conduct an investigation. (Plaintiffs' Statement, ¶ 6; Freedman's Statement, ¶ 16; Tonawanda Defendants' Statement, ¶ 12.) Freedman began his investigation on December 6, 2000, the day he received the complaint. (Freedman's Statement, ¶ 18.)

### 2. Freedman's Investigation

Freedman is an attorney employed by Norton, Radin and Freedman, a law firm that

represents a number of school districts in the Western New York area. (Freedman's Statement, ¶¶ 1, 3, 4.) He graduated from law school in 1996 and was a 5th year associate at the time of the investigation. (Tonawanda Defendants' Statement, ¶¶ 15, 18.) Freedman was not employed by the Board or School District, although Norton, Radin and Freedman had represented the School District for many years. (Freedman's Statement, ¶ 2; Tonawanda Defendants' Statement, ¶¶ 13, 16.) Prior to the time of this incident, Freedman had handled other student discipline matters, had assisted the School District with special education compliance, had conducted Superintendent hearings, had handled Family Educational Rights Privacy Act issues, and had generally provided legal advice on a variety of other matters. (Tonawanda Defendants' Statement, ¶¶ 17, 18.) He did this for other students as well. (Fleming Affirm., Exhibit B.)

On December 6, 2000, Freedman went to Tonawanda High School and interviewed Boykins. (Plaintiffs' Statement, ¶ 7; Freedman's Statement, ¶ 19.) Freedman asked Slavin to bring Boykins to the interview, which took place in a conference room next to Slavin's office. (Freedman's Statement, ¶¶ 20, 21.) Freedman recorded the interview, with the recorder in full view on the table.[7] (Freedman's Statement, ¶¶ 23, 24.) During the interview, Boykins voiced her complaints about, among other things, her allegation that it was Mislin and Mosich who yelled "don't give the nigger a rose" at the pep rally. (Plaintiffs' Statement, ¶ 7.) She also complained of harassment by Fisher, Amanda Reimer, Rich Brumfield, Brian Strauss and Rachel Burkett. (Freedman's Statement, ¶ 28.) Because

---

[7]Freedman interviewed numerous individuals during the course of his investigation, and recorded his interviews of the students. Compact discs containing the interviews have been entered into the record. (See Fleming Affirm., Exhibit B.) This Court has listened to each of them.

Boykins expressed some fear of retribution for making her complaints, Freedman gave her his business card and told her to call him if she needed anything.  (Freedman's Statement, ¶¶ 25, 26.)

On December 15, 2000, Freedman returned to Tonawanda High School and interviewed several of Boykins' friends, including Theresa Maugans, Michael Dieb, Karen Ruch, Tracey Curtis, and Timothy Stuff.  (Plaintiffs' Statement, ¶ 8; Freedman's Statement, ¶ 30.)  Maugans reported that Andrew Beggins used the words "N-Bomb" and "nigger" in her physics and government classes.  (Plaintiffs' Statement, ¶ 9.)  In addition, Boykins and her friends identified Fisher, Jeff Babasuto, Sean McDonald, Adam Hayes, Cori Villetti, Chris Sampson, Beggins, Ryan Herrsome, Ken Mallick and Jeff Bernet as having used the words "N-Bomb," "nigger," "monkey," "fag," and "faggot."  (Plaintiffs' Statement, ¶ 17.)  Two of Boykins' friends – Vicki Medina and Brett Taggart – reported to Freedman that Jeff Berasoto[8] yelled, "sit down you fat fucking niggers" to two black students who were dancing at the pep rally.  (Plaintiffs' Statement, ¶ 17.)

Freedman did not interview Beggins, Fisher, Babasuto, McDonald, Hayes, Villetti, Sampson, Herrsome, Mallick or Bernet about the allegations made against them.  (Plaintiffs' Statement, ¶¶ 9, 18.)  However, he did eventually interview Mislin for 20 minutes on January 16, 2001, and also interviewed Mosich, Reimer and Barkett.  (Plaintiffs' Statement, ¶¶ 10, 11; Tonawanda Defendants' Statement, ¶ 22; Freedman's Statement, ¶ 31.)  During the interview, Mislin never asked to leave the room, did not ask to call his parents, and did not become emotionally upset or cry.  (Tonawanda Defendants'

---

[8]It is unclear whether Jeff Berasoto and Jeff Babasuto are in fact two separate individuals, or whether the last name has been misspelled.

Statement, ¶ 23.)

The day after the interview (January 17, 2001), Boykins called Freedman and told him that Mislin referred to him as a "fag" in a conversation that he was having about the investigation with Burkett.  (Plaintiffs' Statement, ¶ 12.)  Freedman immediately returned to Tonawanda High School and re-interviewed Boykins with Slavin present.  (Plaintiffs' Statement, ¶ 12.)  Boykins told Freedman that Mislin's discussion of the investigation angered her, but Mislin was not directly harassing her.  (Plaintiffs' Statement, ¶ 14.) Freedman then inquired of Boykins whether Mislin's discussion of the investigation was continued harassment against her.  (Plaintiffs' Statement, ¶ 14.)  Although somewhat unclear, it appears that Freedman also met briefly with Mislin again.  (Roshia Aff., Exhibit N; Tr. at 22-23[9].)

Later that day, Slavin issued Mislin a 2-day out-of-school suspension for insubordination because he violated Freedman's directive to refrain from discussing the investigation.  (Plaintiffs' Statement, ¶ 13; Freedman's Statement, ¶¶ 34, 35; Tonawanda Defendants' Statement, ¶¶ 24, 28, 30; Roshia Aff., Exhibit M.)   Mislin denied that Freedman ever directed him not to discuss the investigation.[10]  (Plaintiffs' Statement, ¶ 15.) In fact, Plaintiffs assert that Freedman did not prohibit any other student from discussing the investigation.  (Plaintiffs' Statement, ¶ 16.)  For example, Burkett, who was allegedly discussing the investigation with Mislin, was not disciplined.  (Plaintiffs' Statement, ¶ 16.) Freedman, however, maintains that after each of the interviews, he instructed the students

---

[9]Referring to the oral argument transcript.

[10]This Court notes that on the recording of the interview, there is no directive by Freedman to Mislin not to discuss the investigation.  (Fleming Affirm., Exhibit B.)

not to discuss the investigation. (Freedman's Statement, ¶ 32.) Mislin did not appeal to either the Superintendent or the Board, and served his 2-day suspension on January 18 and 19, 2001, without incident. (Tonawanda Defendants' Statement, ¶¶ 31, 32, 33.)

At the conclusion of the investigation, Freedman determined that Mislin engaged in several acts of harassment, including making the "all the fags should be put in a camp and killed like the Jews" and the "don't give the nigger a rose" comments. (Plaintiffs' Statement, ¶¶ 19, 20; Tonawanda Defendants' Statement, ¶ 35; Roshia Aff., Exhibit N.) Freedman also determined that Reimer, Mosich, Barkett, Brumfield and Strauss should be disciplined. (Roshia Aff., Exhibit N.)

Freedman prepared his final report and provided it to Greene on February 26, 2001, with copies to the Board. (Freedman's Statement, ¶ 36; Roshia Aff., Exhibit N.) Therein, Freedman recommended that Greene impose 5 days of in-school suspension[11] on Mislin. (Plaintiffs' Statement, ¶ 23; Freedman's Statement, ¶ 38; Roshia Aff., Exhibit N.) He also recommended that Reimer and Mosich each receive 2 days of in-school suspension, and that Burkett, Strauss and Brumfield each receive 1 day of in-school suspension. (Plaintiffs' Statement, ¶ 23; Freedman's Statement, ¶ 38; Roshia Aff., Exhibit N.) Slavin, however, objected to the discipline because of the length of time between the conduct and the punishment, approximately 6 months. (Plaintiffs' Statement, ¶ 25.)

The School District and the Board were free to accept or reject Freedman's conclusions and recommendations. (Freedman's Statement, ¶ 39.) In fact, Freedman's

---

[11]During an in-school suspension, a student arrives at school at the regularly scheduled time, but does not attend classes. (Tonawanda Defendants' Statement, ¶ 37.) Instead, the student completes education assignments in a study hall. (Tonawanda Defendants' Statement, ¶ 37.)

recommendation as to Mislin was not followed.  (Freedman's Statement, ¶ 39.)  On April 2, 2001, Bagdley informed Plaintiffs that Mislin would receive a 4-day in-school suspension, which was 1 day less than what Freedman recommended.  (Plaintiffs' Statement, ¶ 24; Freedman's Statement, ¶ 39; Tonawanda Defendants' Statement, ¶ 36.) Badgley advised Plaintiffs that Mislin was being suspended based on Freedman's conclusion that he had committed racial and homosexual harassment.  (Plaintiffs' Statement, ¶ 36.)

Because Slavin was out of town on the day the discipline was imposed, Freedman joined Badgley for a meeting with Plaintiffs and Mislin to discuss the punishment, which took place on April 3, 2001.  (Freedman's Statement, ¶¶ 40, 41; Tonawanda Defendants' Statement, ¶ 38.)   Mislin served the 4-day suspension from April 3-6, 2001.  (Plaintiffs' Statement, ¶ 27; Tonawanda Defendants' Statement, ¶ 39; Roshia Aff., Exhibit O.)

Plaintiffs and Mislin repeatedly requested that the School District remove the written Deportment from Mislin's student record, but the School District refused.  (Plaintiffs' Statement, ¶ 27.)  Plaintiffs wanted the Deportment removed so that Mislin could join the United States Marines after graduation.  (Plaintiffs' Statement, ¶ 27.)  Plaintiffs appealed the School District's refusal to remove the written Deportment and requested an Education Law Hearing.  (Plaintiffs' Statement, ¶ 28.)  A hearing was scheduled for June 18, 2001, but it never took place.  (Plaintiffs' Statement, ¶ 28.)  On June 12, 2001, six days before the scheduled hearing, Mislin took his own life.  (Freedman's Statement, ¶ 49; Tonawanda Defendants' Statement, ¶ 7.)

On the morning of his death, Mislin "cut school" and attended a party at Matt Meyers' house with some of his friends, at which they were drinking vodka.  (Freedman's

Statement, ¶ 45; Tonawanda Defendants' Statement, ¶¶ 8, 44, 50-52.)  Several students were involved in an automobile accident as they left the party.  (Freedman's Statement, ¶ 46; Tonawanda Defendants' Statement, ¶ 9.)  They too had been drinking.  (Tonawanda Defendants' Statement, ¶ 9.)  Mislin witnessed the accident, but was not involved in it. (Freedman's Statement, ¶ 46; Tonawanda Defendants' Statement, ¶¶ 9, 53.)  When the police arrived and began to question Mislin, he was uncooperative and intoxicated. (Freedman's Statement, ¶ 46, McClaren Decl., Exhibit O.)  Officer Michael Falzone testified that Mislin had an odor of alcohol on his breath, had glassy and blood-shot eyes, had slurred speech and was "very belligerent."  (Tonawanda Defendants' Statement, ¶ 42; McClaren Decl., Exhibit O.)  Because Mislin was causing problems at the accident scene by impeding the investigation and the administration of first aid to the driver of the vehicle, members of the fire department requested that Mislin be removed.  (Tonawanda Defendants' Statement, ¶ 43.)  Police officers took Mislin to the police station. (Freedman's Statement, ¶ 47; Tonawanda Defendants' Statement, ¶¶ 9, 43; McClaren Decl., Exhibit O.)

At the police station, Mislin asked that his Marine recruiter be contacted. (Tonawanda Defendants' Statement, ¶ 45.)  Officers also called Mislin's father. (Tonawanda Defendants' Statement, ¶ 47.)  Mislin left the station at Noon on June 12, 2001, with his father and the Marine recruiter.  (Freedman's Statement, ¶ 48; Tonawanda Defendants' Statement, ¶¶ 9, 47, 48.)  Several hours later, Mislin shot himself at his home. (Freedman's Statement, ¶ 49; Tonawanda Defendants' Statement, ¶ 55.)  Mislin did not attend any classes on the day of his death, nor was he ever on school grounds. (Tonawanda Defendants' Statement, ¶¶ 50, 52, 54.)  Mislin's suicide note stated, "I'm sorry

for all the shit I've put you through."  (Plaintiffs' Statement, ¶ 42.)

## B.    Procedural History

Plaintiffs instituted this action on April 10, 2002, by filing a Complaint in the United States District Court for the Western District of New York.  They filed an Amended Complaint on August 16, 2002.  The defendants filed Motions to Dismiss on August 23, 2002, which this Court granted in part and denied in part on March 30, 2003.  The parties then completed discovery, and on November 15, 2005, the defendants filed the Motions for Summary Judgment currently at bar.  After the completion of briefing, this Court held oral argument on May 31, 2006, and reserved decision thereafter.

## III.  DISCUSSION AND ANALYSIS

## A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion."  Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26

L.Ed.2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.

**B.    Federal Causes of Action**

　　**1.    Constitutional Claims against Greene and Freedman**

　　　　**a.    42 U.S.C. § 1983**

　　Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws.  See 42 U.S.C. § 1983.  On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution.  See Graham v. Connor, 490 U.S. 386, 393-94,109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)).  Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged.  See Baker, 443 U.S. at 140.

　　It is further necessary to establish a defendant's personal involvement in the alleged constitutional deprivation.  Personal involvement is a *sine qua non* of liability under § 1983. See Haygood v. City of New York, 64 F.Supp.2d 275, 280 (S.D.N.Y. 1999).  And it is well settled in this circuit that personal involvement by defendants in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983.  See

McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); Richardson v. Coughlin, 101 F.Supp.2d 127, 129 (W.D.N.Y. 2000).  The Second Circuit defines personal involvement in this context as "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates."  Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).

Here, there is no dispute that the § 1983 claims against Greene and Freedman in Plaintiffs' first cause of action are grounded in the Fourth and Fourteenth Amendments. However, Greene maintains that she is entitled to summary judgment because she was not personally involved in the alleged constitutional deprivations.  In addition, Freedman argues that he is entitled to summary judgment because, as an independent attorney retained to conduct the investigation, he is not a state actor for § 1983 purposes.  Further, both Greene and Freedman argue that summary judgment in their favor is warranted because no constitutional violations occurred.  Finally, Greene and Freedman argue that even assuming the existence of a constitutional violation, they are shielded from liability by the doctrine of qualified immunity.

Greene and Freedman's assertion of the qualified immunity defense triggers a two-step analysis.  This Court must first determine whether a constitutional right has been violated, and then determine whether that right was "clearly established" at the time of the alleged violation.  Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Jones v. Parmley, 465 F.3d 46, 55 (2d Cir. 2006); Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004).  In conducting this analysis, this Court will assume without deciding that

Greene was personally involved in the alleged constitutional violations and that Freedman qualifies as a state actor.

### b.    Fourth Amendment

The Fourth Amendment to the United States Constitution is applicable to the States through the Fourteenth Amendment.  Minnesota v. Dickerson, 508 U.S. 366, 372, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334 (1993).  It protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Without question, Fourth Amendment protection extends to students attending public schools.  Cf. Bd. of Ed. Of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. 822, 82, 122 S.Ct. 2559, 2564, 153 L.Ed.2d 735 (2002); New Jersey v. T.L.O., 469 U.S. 325, 334, 105 S.Ct. 733, 738-39, 83 L.Ed.2d 720 (1985); Phaneuf v. Fraikin, 448 F.3d 591 (2d Cir. 2006).  The nature and scope of students' constitutional rights, however, are concomitant with their status as children in school.  See Veronia Sch. Dist. 47J v. Acton, 515 U.S. 646, 656, 115 S.Ct. 2386, 2392, 132 L.Ed.2d 564 (1995); see also Florida v. J.L., 529 U.S. 266, 274, 120 S.Ct. 1375, 1380, 146 L.Ed.2d 254 (2000) (recognizing that students possess diminished Fourth Amendment rights).

In T.L.O., the United States Supreme Court determined that the Fourth Amendment applies to searches of students and their belongings, and directed that the reasonableness of such searches be assessed with consideration of the context in which the search takes place.  T.L.O., 469 U.S. at 337.  Noting that the constitutionality of a search "should depend simply on the reasonableness, under all the circumstances, of the search," the Court set forth a two-fold reasonableness inquiry: "first, the court must consider whether

the action was 'justified at its inception,' and second, the court must determine whether the action, as it actually transpired, was 'reasonably related in scope to the circumstances which justified the interference in the first place.'" Bisignano v. Harrison Cent. Sch. Dist., 113 F.Supp.2d 591, 596 (S.D.N.Y. 2000) (quoting T.L.O., 469 U.S. at 339, 341).

T.L.O., however, does not address whether the Fourth Amendment applies to the *seizure* of a student by school officials. The parties recognize that the Second Circuit has likewise not squarely addressed this issue, but they urge this Court to apply the two-part T.L.O. test in this case. In light of the persuasive authority from other courts of appeals and the application of the T.L.O. standard by district courts in this circuit, see, e.g., Bisignano, 113 F.Supp.2d at 596 (recognizing that Second Circuit has not addressed this issue and applying the T.L.O. test to the seizure of a student), this Court will evaluate the reasonableness of the seizure in this case using the T.L.O. framework. See Shuman v. Penn Manor Sch. Dist., 422 F.3d 141, 148-49 (3d Cir. 2005) (seizures in public school context are governed by reasonableness standard); Doe v. Haw. Dep't of Educ., 334 F.3d 906, 908 (9th Cir. 2003) ("reasonableness of seizure must be considered in light of the educational objectives" trying to be achieved); Hassan v. Lubbock Indep. Sch. Dist., 55 F.3d 1075, 1079 (5th Cir. 1995)("while school officials are subject to the limitations of the fourth amendment, the reasonableness of seizures must be determined in light of all of the circumstances, with particular attention being paid to whether the seizure was justified at its inception and reasonable in scope"); Wallace v. Batavia Sch. Dist., 68 F.3d 1010, 1012-15 (7th Cir. 1995) (holding that seizure of a public school student violates the Fourth Amendment "only when the restriction of liberty is unreasonable under the circumstances

then existing and apparent"); Edwards v. Rees, 883 F.2d 882, 884-85 (10th Cir. 1989)(applying T.L.O. standard to determine whether school official violated the Fourth Amendment by interrogating a student for 20 minutes regarding a bomb threat); see also Gorthy v. Clovis Unified Sch. Dist., No. CVF05-1052, 2006 WL 236939, at *3 (E.D.Cal. Jan. 31, 2006) ("[T]he Fourth Amendment governs a teacher's seizure of a student.").

A student is considered "seized" within the meaning of the Fourth Amendment if a reasonable person under like circumstances would not feel free to leave. Gorthy, 2006 WL 236939, at *3 (citing Doe, 334 F.3d at 909); see also Shuman, 422 F.3d at 147 ("A seizure occurs for Fourth Amendment purposes when "a reasonable person would have believed that he was not free to leave.") (citing Michigan v. Chesternut, 486 U.S. 567, 573, 198 S.Ct. 1975, 100 L.Ed.2d 565 (1988)); Doe, 334 F.3d at 909 (a seizure in the constitutional sense occurs "when there is a restraint on liberty to the degree that a reasonable person would not feel free to leave").  Here, it is not contested that Mislin was seized for purposes of the Fourth Amendment when, on January 16, 2001, he was removed from his class during the school day and required to sit for a 20-minute, closed-door, recorded interview with Freedman.[12]   The question is whether this seizure was reasonable "under the circumstances then existing and apparent." Wallace, 68 F.3d at 1012-15.

"In determining what limits the Constitution places on the investigative and disciplinary activities of school authorities, the courts have always sought to accommodate

---

[12]As noted, there is also an indication in the record that Freedman briefly seized Mislin on January 17, 2001, to inquire about his discussion of the investigation with Burkett.  (Roshia Aff., Exhibit N; Tr. at 22-23.)  For purposes of the legal arguments, the parties have discussed these two seizures together as a single seizure lasting approximately 20 minutes.  (Tr. at 22-23.)  Following the parties' lead, and because there is no meaningful difference between the two seizures (other than duration), this Court will discuss them as a single seizure as well.

both the interests protected by the Constitution and the interests in providing a safe environment conducive to education in the public schools." Edwards, 883 F.2d at 883-84. Again, the test from T.L.O. first requires examination of whether the seizure was "justified at its inception," and second, whether it was "reasonably related in scope to the circumstances which justified the interference in the first place." See T.L.O., 469 U.S. at 341.

In this context, the seizure of a student by school officials for purposes of conducting an interview is "justified at its inception" if there are reasonable grounds for suspecting that it will assist the officials in gathering evidence or information concerning whether there has been a violation of the law or school rules. Cf. T.L.O., 469 U.S. at 341-42 ("Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school.") The scope of a seizure is permissible if it is reasonably related to the circumstances that justified the seizure of the student in the first place. Cf. Phaneuf, 448 F.3d at 596. This assessment must be based on only those facts known to school officials *prior* to the seizure. Cf. Phaneuf, 448 F.3d at 597 (review of a school search requires consideration of only facts known at time of search) (citing J.L., 529 U.S. at 271).

For example, in Edwards, the court examined a vice-principal's removal of a student from class for questioning concerning a bomb threat. 883 F.2d at 884. The court concluded that the seizure was justified at its inception because the two students who reported the threat implicated the seized student as the individual responsible. Id. at 884.

Moreover, the court found the scope of the seizure reasonable because the questioning directly related to the bomb threat and "might 'turn up evidence that [the seized student had] violated . . . either the law or the rules of the school." Id. at 884 (quoting T.L.O., 469 U.S. at 342.)

Plaintiffs argue that the seizure in this case was not justified at its inception because there were no exigent circumstances that warranted interviewing Mislin without his parents, in a room with the door closed.  Plaintiffs also argue that Freedman's interview of Mislin was not justified because Mislin was previously disciplined for the events that formed the basis of Boykins' complaint, which had occurred three months prior to the interview, and there was a delay of approximately six weeks between Freedman's first interview of Boykins and his interview of Mislin.  None of these arguments are persuasive.

It is clear from the record that school officials considered Boykins' complaint to be a very serious matter.  They wanted to investigate not only the substance of her complaint, but also the sufficiency of the teachers' and administrators' response to the previous complaints of harassment.  Thus, the issues raised by Boykins' formal complaint to the Board were broader than the isolated conduct previously addressed by Slavin and Badgley in the Fall of 2000.  That is, Boykins complained not only of the students' harassing conduct, but also complained that teachers and administrators were letting those students "get away with it" by not responding to or disciplining them appropriately.  (See Roshia Aff., Exhibit H.)  As such, the previous discipline imposed on Mislin did not resolve or address all of the issues raised in Boykins' complaint.

Moreover, in this Court's view, Plaintiffs' identification of some delay in the

investigation is not constitutionally significant.  Freedman received the complaint on the same day he interviewed Boykins.  Presumably after taking some time to familiarize himself with Boykins and her complaint, and to determine the course of the investigation, Freedman continued his work and conducted additional interviews on December 13 and 15, 2000.  (Roshia Aff., Exhibit N.)  Although not detailed in the record, undoubtedly Tonawanda High School had a winter recess over the Christmas and New Year's holiday.[13] After this break, Freedman conducted an interview on January 11, 2001, and then interviewed Mislin, Mosich and Reimer on January 16, 2001.  Based on this time line, this Court finds no undue or unreasonable delay in Freedman's investigation.

As for exigent circumstances, Plaintiffs cite no authority requiring that exigent circumstances be present before a school official is authorized under the Fourth Amendment to question a student in the course of an ongoing investigation.  To be sure, some of the relevant cases in this area arguably involve "exigent circumstances," however the reasonableness of those searches did not hinge on the fact that such circumstances were present.  See, e.g., Edwards, 883 F.2d at 884 (finding seizure and interview reasonable where student was implicated in a "serious incident" (bomb threat) because questioning was related to whether he was responsible for the threat, as opposed to a need for school authorities to quell a dangerous situation).  Indeed, requiring that exigent circumstances be present before a school official may question a student in a disciplinary matter in the absence of his or her parents would likely prove unworkable, and would intrude on the necessary discretion retained by administrators to conduct the day-to-day

---

[13]Defendant Freedman's attorney represented at oral argument that there was in fact a "Christmas break."  (Tr. at 77.)

operation of public schools.  Put simply, Plaintiffs have not established that the Fourth

Amendment requires the existence of exigent circumstances before a school official is

authorized to question a student during the course of an internal investigation without his

or her parents present.  Cf. Shuman, 422 F.3d at 144-46 (upholding 4-hour seizure and

questioning of student in the absence of his parents concerning an isolated incident of

sexual assault that occurred three days earlier; no exigent circumstances present).

Finally, Plaintiffs' argument that Freedman's closing of the door and recording of

Mislin's interview makes the seizure unreasonable under the Fourth Amendment is

unpersuasive.  Almost every interview Freedman conducted during the course of the

investigation was conducted in the very same manner as Mislin's.  There is no evidence

or suggestion in the record that the door was closed for any reason other than to keep the

meeting private and confidential.[14]  Moreover, each student (including Mislin) was aware

that the interview was being recorded and the recording device was plainly visible on the

table.

Plaintiffs further argue that Freedman's investigation was not reasonably related in

scope because he impermissibly expanded the investigation to include incidents of anti-

homosexual and anti-Semitic animus.  This argument, however, is flatly contradicted by

Boykins' complaint, which included allegations that Mislin and others shouted "all the fags

should be put in a camp and killed like the Jews" while standing at their lockers.  (Plaintiffs'

Statement, ¶ 5.)  Thus, from its inception, the subject matter of the complaint included

---

[14]It appears that keeping the door closed was also a practical necessity given the fact that the interview room was located in the school office.  During many of the recorded interviews, one can hear background noises such as a running photocopy machine, telephones ringing and people speaking. (Fleming Affirm., Exhibit B.)

21

incidents of anti-homosexual and anti-Semitic harassment. Moreover, Freedman's interview questions focused on the allegations in Boykins' complaint and the teachers' responses thereto without any impermissible straying. (Fleming Affirm., Exhibit B.)

There is no dispute that Boykins' complaint specifically named Mislin as engaging in homosexual and racial harassment, and further included a complaint that Mislin and others were "getting away with" their conduct. Greene, as Superintendent, determined that the allegations in the complaint were serious and required investigation. She therefore retained Freedman for that purpose, who immediately commenced and conducted an investigation. After gaining additional information concerning Mislin's involvement from interviews of Boykins and several other students, Freedman requested that Mislin be removed from his class so that he could be interviewed. Freedman's interview with Mislin lasted 20 minutes, and the questions Freedman posed related to Mislin's involvement in homosexual and racial harassment. During the interview, Freedman did not raise his voice, did not discuss any possible criminal liability and did not have any physical contact with Mislin. Mislin never asked to leave the room, did not ask to call his parents, and did not become emotionally upset or cry. Further, at no time did *any* school official have any physical interaction with Mislin or use physical force either to effectuate his seizure or during the interview.[15]

On these facts, this Court finds without pause that the seizure in this case was justified at its inception and reasonably related to the substance of the investigation. See

---

[15]For this reason, Plaintiff's reliance on <u>Bisignano</u> is misplaced. <u>Bisignano</u> is distinguishable because it involved the reasonableness of a teacher *physically seizing* a student by grabbing her arms and forcing her into an equipment closet over a dispute about a lost $20 bill. <u>See</u> 113 F.Supp.2d at 594-95.

Edwards, 883 F.2d at 884 (where the Tenth Circuit found that the removal of a student from class for twenty minutes of questioning in the school building was justified at its inception and reasonably related in scope to determining whether the student was involved in making a bomb threat); Shuman, 422 F.3d at 149 (where the Third Circuit found that detaining a student for purposes of permitting school officials to investigate a female student's report of serious sexual misconduct and to determine an appropriate punishment was reasonable seizure under the Fourth Amendment). Consequently, this Court concludes that Greene and Freedman did not violate Mislin's Fourth Amendment right to be free from unreasonable seizure. Their Motions for Summary Judgment on this claim will therefore be granted.

### c. Fourteenth Amendment

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); see also Sound Aircraft Servs., Inc. v. Town of East Hampton, 192 F.3d 329, 335 (2d Cir.1999) ("[a]t its core, equal protection prohibits the government from treating similarly situated persons differently").

A "traditional" equal protection claim "protects against [classification-based] discrimination," such as race or national origin.[16] Inturri v. City of Hartford, 365 F.Supp.2d

---

[16]It appears that Plaintiffs' equal protection claims are limited to "class of one" and LeClair claims as further discussed. To the extent Plaintiffs maintain a traditional race-based equal protection claim, Greene and Freedman are entitled to summary judgment. As discussed later in the context of Plaintiffs' §

240, 248 (D.Conn. 2005).  Two other related equal protection claims are also recognized.

See Cobb v. Pozzi, 363 F.3d 89, 109 (2d Cir. 2004).  First, in Vill. of Willowbrook v. Olech,

the United States Supreme Court recognized a "class of one" claim.  528 U.S. 562, 564,

120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).  Second, in LeClair v. Saunders, the Second

Circuit recognized an equal protection claim based on malicious or bad faith intent to injure.

627 F.2d 606, 609-10 (2d Cir. 1980).  Although somewhat unclear, it appears that Plaintiffs

allege both "class of one" and LeClair claims.[17]  (See Plaintiffs' Memorandum of Law, p.

2.)  Both fail.

### (1)    "Class of One" Equal Protection Claim

To succeed on a "class of one" claim, the plaintiff must prove that (1) he has been

intentionally treated differently from others who are similarly situated to him, and (2) that

there is no rational basis for the difference in treatment.  See Olech, 528 U.S. at 564.  To

meet the "similarly situated" requirement, "the level of similarity between [the] plaintiff[ ] and

the persons with whom [he] compare[s himself] must be extremely high."  Neilson v.

D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005); see also Clubside, Inc. v. Valentin, 468 F.3d

---

1981 and Title VI claims, there is no evidence in the record of any race-based discrimination (or reverse-race discrimination) against Mislin. In any event, Plaintiffs' race-based equal protection claims are also subject to dismissal because they are subsumed by their Title VI claims.  See Bayon v. State Univ. of N.Y. at Buffalo, No. 98-CV-578E, 2001 WL 135817, at *3 (W.D.N.Y. 2001)("plaintiff's § 1983 claims, as pled, are not separate and distinct from his Title VI and ADA claims.  Where Congress has established the enforcement mechanism containing remedial devices that are sufficiently comprehensive, as it has done with Title VI and the ADA, those enforcement mechanisms may not be bypassed by bringing suit under § 1983.").

[17]In their papers and at oral argument, Plaintiffs concede that they did not plead their Fourteenth Amendment selective enforcement theories in their Amended Complaint and that the theory was developed in response to the defendants' motions for summary judgment.  (Tr. at 5, 14-15, 50-52, 93-94.)  While this Court finds merit in the defendants' position that Plaintiffs should not, at the summary judgment stage, be permitted to add a new claim or theory, see generally Beckman v. U.S. Postal Serv., 79 F.Supp.2d 394, 407 (S.D.N.Y. 2000), it will nonetheless entertain Plaintiffs' claims for the sake of completeness.

144, 159 (2d Cir. 2006).  The person must be "similarly situated" in all material respects to the point where they are "prima facie identical" to the plaintiff.[18]  Neilson, 409 F.3d at 105; Inturri, 365 F.Supp.2d at 251.

The Second Circuit requires a "class of one" plaintiff to show that:

(I)    no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate governmental policy; and

(ii)   the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

Goldfarb v. Town of West Hartford, No. 03CV862, 2007 WL 290283, at *7 (D.Conn. Feb. 1, 2007)(citing Neilson, 409 F.3d at 105).

While the "similarly situated" question is ordinarily a factual issue to be reserved for the jury, "'a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'"  Goldfarb, 2007 WL 290283, at *7 (quoting Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001)); Clubside, 468 F.3d at 159 ("A court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation, however, where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated.").  Such is the case here. Based on the evidence of record, no reasonable jury could find that Plaintiffs have identified a "similarly situated" individual who was treated differently than Mislin.

---

[18]In their papers, Plaintiffs suggest that this Court apply the lower "similarly situated" standard used in employment discrimination cases.  (See Plaintiffs' Memorandum of Law, p. 3.)  The Second Circuit has flatly rejected this approach.  In Clubside, the court stated that the "similarly situated" inquiry in "class of one" cases is "more stringent than that used at the summary judgment stage in the employment discrimination context."  468 F.3d at 159 (citing Neilson, 409 F.3d at 104).

Plaintiffs first contend that Mislin was similarly situated to all other Tonawanda High School students, including Boykins and the other accusers, in the broad sense that the school owes the same duty of care to each student.  In the abstract, this may be true.  However, equal protection claims require a more exacting identification of a similarly situated individual; they must be "prima facie identical." Neilson, 409 F.3d at 105.  Of course, not every student at Tonawanda High School had harassment complaints filed against them. Obviously, there is a stark difference between a student accused of harassment and one who is the victim of harassment.  While both the accuser and the accused are perhaps owed an unrelated overarching duty of care by a school emanating from the fact that the school stands *in loco parentis*, they are obviously not "prima facie identical" for purposes of an investigation into wrongdoing.  The obvious differences between an accused and a victim undoubtedly justify treating them differently.  See Shuman, 422 F.3d at 151 (finding that an accuser and a victim were *not* similarly situated for purposes of an equal protection claim).

Plaintiffs also contend that the other students Boykins accused of harassment were also similarly situated to Mislin.  This is at least a closer comparison.  However, these students also were not identical to Mislin.  It is reasonable to conclude that Mislin was the main subject of Boykins' complaint by virtue of the fact that he was twice included by name, was allegedly involved in each incident listed in the complaint, and was viewed by Boykins as one of the students who were "getting away" with their conduct.  Thus, the other accused students, who were not main subjects of a complaint, were not similarly situated.

However, even assuming that others who were investigated and interviewed (for

26

example Mosich and Reimer) were similarly situated to Mislin, it cannot reasonably be concluded that they were treated more favorably.[19]  The varying degrees of punishment Freedman recommended for the students he found "guilty" is not indicative of differential treatment, but rather, is justified by the students' varying degrees of culpability.  (See Roshia Aff., Exhibit N.)  For example, Freedman found that Mislin harassed Boykins on at least five separate occasions, where as the others directly harassed Boykins only once. (Roshia Aff., Exhibit N.)  Freedman also determined that Mislin was uncooperative and dishonest.  (Id.)

Having drawn all inferences and resolved all ambiguities in Plaintiffs' favor as required, this Court finds that Plaintiffs' "class of one" equal protection claim must fail for lack of a "similarly situated" comparator.  Based on the record before this Court, no rational jury could conclude that there was a student "similarly situated" to Mislin who was treated differently.  Consequently, the defendants' Motions for Summary Judgment on this claim will be granted.

### (2)   LeClair Equal Protection Claim

A LeClair claim asserts a violation of equal protection based on a theory of selective prosecution.  To succeed on such a claim, the plaintiff must establish both "(1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith

---

[19]Students who were accused of harassment or identified during the various interviews, but were not interviewed or further investigated are not "prima facie identical" to Mislin for those very reasons.

intent to injure the plaintiff." Harlen, 273 F.3d at 499; see also Crowley v. Courville, 76 F.3d 47, 52-53 (2d Cir. 1996).  "To prevail, plaintiffs must prove that the disparate treatment was *caused by* the impermissible motivation. Bizzarro v. Miranda, 394 F.3d 82, 87 (2d Cir. 2005).  LeClair claims are seemingly disfavored and rarely successful.  See Bizzaro, 394 F.3d at 86 (collecting cases and noting that "rarely" has a constitutional violation been found based on the LeClair formulation).  The Second Circuit has noted that "cases predicating constitutional violations on selective treatment motivated by ill-will, rather than by protected-class status or an intent to inhibit the exercise of constitutional rights, are lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply."  Id. (citing LeClair, 627 F.2d at 608).

Plaintiffs hurl allegations aplenty regarding Freedman's and the other defendants' ill will toward Mislin, but as just noted, they fail to identify a similarly situated individual who was unjustifiably treated more favorably.  This is fatal because "demonstrating that a plaintiff has been treated differently from similarly situated individuals is 'the *sine qua non* of a LeClair 'selective enforcement' violation.'"  Goldfarb, 2007 WL 290283, at *9 (quoting John Doe No. 1 v. Vill. of Mamaroneck, 462 F.Supp.2d 520 (S.D.N.Y. 2006)).  Accordingly, this Court finds that Plaintiffs have failed to identify a sufficiently similar individual for purposes of pursuing a "selective enforcement" LeClair equal protection claim.  Summary judgment in the defendants' favor is therefore warranted and will be granted.

### d.    Qualified Immunity

Even if it was determined that Greene and/or Freedman violated Mislin's constitutional rights, this Court finds that both are protected by qualified immunity.  "The

doctrine of qualified immunity protects state officials from civil liability for actions performed in the course of their duties 'if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Luna, 356 F.3d at 490 (quoting Wilson v. Layne, 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)); Velez v. Levy, 401 F.3d 75, 100 (2d Cir. 2005).   State officials who engage in actions that they "reasonably believe to be lawful" are protected.   Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).   A defendant is therefore shielded from liability if he did not violate clearly established law or it was objectively reasonable for him to believe that he was not acting contrary to clearly established law. Luna, 356 F.3d at 490; Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003).

The Second Circuit has determined that a right is clearly established if

> (1) the law is defined with reasonable clarity,
>
> (2) the Supreme Court or the Second Circuit has recognized the right, and
>
> (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.

Luna, 356 F.3d at 490 (citing Recore, 317 F.3d at 197).   The relevant inquiry is whether "a reasonable person in the defendant's position should know about the constitutionality of the conduct."   McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278 (2d Cir. 1999).   The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."   Creighton, 483 U.S. at 640.

Most recently, the United States Supreme Court reiterated that the inquiry into whether the right was clearly established "'must be undertaken in light of the specific

context of the case, not as a broad general proposition.'" Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (per curiam) (quoting Saucier, 533 U.S. at 201).  For example, Brosseau involved the question of whether a police officer who shot a fleeing suspect in the back was entitled to qualified immunity.  The Court identified the relevant right not as whether it was "clearly established" that the Fourth Amendment prohibits excessive use of force, but rather, whether the decision "to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight" violates the Fourth Amendment.  543 U.S. at 198-200.  The Court's analysis of the relevant caselaw existing at the time of the shooting revealed that such a particularized right was not then clearly established.  Id. at 200-01.

Moreover, "even assuming a state official violates a plaintiff's constitutional rights, the official is protected nonetheless if he objectively and reasonably believed that he was acting lawfully." Luna, 356 F.3d at 490.  "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam) (quoting Malley v. Briggs, 475 U.S. 335, 341, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

This Court finds that Greene and Freedman are protected by the doctrine of qualified immunity.  Prior to oral argument on the present motions, this Court sought clarification as to the constitutional rights Plaintiffs assert were "clearly established" because it detected confusion in the papers.  See Mislin v. City of Tonawanda Sch. Dist., No. 02-CV-273, 2006 WL 1144618, at *2 (W.D.N.Y. May 1, 2006).  This Court noted that

30

> [t]here appears to be some confusion regarding the nature of rights that are alleged to have been violated. Defendant Greene identifies the right as "a constitutional right to remain in class uninterrupted." (Defendant Greene's Memorandum of Law, p. 13.) The rights are also described as perhaps encompassing a right not to record a student interview. (Defendant Greene's Reply Memorandum of Law, p. 7.) There is additionally some suggestion that the right protects against "acrimonious questioning" in a school interview. (Plaintiffs' Memorandum of Law, p. 26.) Plaintiffs shall identify the specific rights that they allege were violated within the Fourth and Fourteenth Amendments to enable this Court to conduct the necessary qualified immunity analysis.

Id.

In their submission filed in response to this Order, Plaintiffs cite T.L.O. and identify their Fourth Amendment right as "a student's right to be free from unreasonable searches and seizures of his person by school officials."[20] (Plaintiffs' Supplemental Memorandum of Law, p. 14.) T.L.O., however, did not involve the *seizure* of a student, and the facts in T.L.O. are wholly distinguishable from the facts of this case. Moreover, Plaintiffs' reliance on T.L.O. for this purpose amounts to the identification of a broad constitutional right, not one specific to the context of this case.[21] See Brosseau, 543 U.S. at 198.

---

[20]At oral argument, Plaintiff's counsel similarly defined the Fourth Amendment right as "the clearly established right . . . to be free from unreasonable seizures." (Tr. at 72.)

[21]The United States Supreme Court has highlighted the danger that stems from courts accepting broad, generalized constitutional rights in the context of determining qualified immunity. It has explained:

> The right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established law. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727 (1982). Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

31

Plaintiffs come closer to identifying a particularized Fourth Amendment right when they state

> the issue becomes whether (1) [sic] a reasonable official (in this case an attorney) investigating a racial harassment complaint could have believed that pulling Ted Mislin, Jr. out of class to undergo a tape-recorded interrogation of him (by the attorney with an assistant present) for twenty minutes in a closed-door room without parental consent or notification where no exigent circumstances existed that required the immediate questioning of Ted Mislin, Jr. . . . was lawful.

(Plaintiffs' Supplemental Memorandum of Law, p. 13.)

In this Court's view, in order for qualified immunity not to apply, it must have been "clearly established" as of January 16, 2001, that a school official investigating a serious and specific harassment complaint that identifies both the complainant and the alleged harasser, and where that official further corroborates the alleged harasser's involvement through additional investigation, violates the Fourth Amendment's prohibition on unreasonable seizure when he removes the alleged harasser from the classroom for purposes of conducting a recorded 20-minute interview behind closed doors in the absence of the alleged harasser's parents. Cf. Brosseau, 543 U.S. at 198-200 (discussing the need to set forth a specified Fourth Amendment right). Plaintiffs have not identified a single case existing as of January 16, 2001, that stands for this proposition. As such, even assuming that there was a Fourth Amendment violation, Greene and Freedman are entitled to the protections of qualified immunity. See Russell v. Scully, 15 F.3d 219, 223 (2d Cir. 1993) (defendant entitled to qualified immunity because complained of conduct did not violate a

---

Creighton, 483 U.S. at 640.

clearly established right based upon "the caselaw of the Supreme Court and this circuit");

Rhodes v. Guarricino, 54 F.Supp.2d 186, 194 (S.D.N.Y. 1999) ("It is well-established that

if, at the time of the complained of conduct, the law of the Supreme Court or the applicable

circuit has not clearly established that such conduct violates the Constitution, the state

actor is entitled to qualified immunity.").

Plaintiffs identify Mislin's Fourteenth Amendment right as the right to be afforded the

same standard and duty of care as all other students.    (Plaintiffs' Supplemental

Memorandum of Law, p. 17.)  This assertion ignores the fact that the Equal Protection

clause protects "similarly situated" individuals. See Cleburne, 473 U.S. at 439 (stating that

the Fourteenth Amendment Equal Protection clause directs that "persons similarly situated

be treated alike").  As indicated above, Plaintiffs have failed to identify any similarly situated

students. In the absence of any similarly situated individuals, this Court finds that it was

objectively reasonable for Greene and Freedman to believe that their interview and

investigation of Mislin conducted in the course of the overall investigation into Boykins'

complaint was not contrary to clearly established equal protection law.  See Recore, 317

F.3d at 197.  Consequently, even assuming that there was a Fourteenth Amendment

violation, Greene and Freedman are shielded from liability by the doctrine of qualified

immunity.

### 2.    Constitutional Claims against the School District

Plaintiffs' second cause of action alleges a claim under 42 U.S.C. § 1983 against

the School District for "failing to properly screen, hire, and train" Greene and Freedman in

violation of the Fourteenth Amendment.

Section 1983 applies to municipalities such as the School District, but there is no *respondeat superior* liability.  Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978).  Rather, a municipality will be liable for a § 1983 violation only where the municipality itself was the "moving force" behind the deprivation of a plaintiff's federal rights.  See Bd. of the County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 400, 117 S.Ct. 1382, 1386, 137 L.Ed.2d 626 (1997).  That is, "a municipality will not be held liable solely because it employs a tortfeasor."  Bisignano, 113 F.Supp.2d at 601 (citing Bryan County, 520 U.S. at 403).

"Municipal liability under § 1983 occurs, if at all, at the level of policy-making." Ciraolo v. City of New York, 216 F.3d 236, 242 (2d Cir. 2000).  "In order to establish the liability of a municipality in an action under § 1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must establish that the violation of his constitutional rights resulted from a municipal custom or policy."  Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995).  Such a policy may be inferred from a failure to train, such as Plaintiffs have alleged here.  See DeCarlo v. Fry, 141 F.3d 56, 61-62 (2d Cir. 1998).  A municipality's failure to train its employees must rise to the level of deliberate indifference.  See Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993).

> Deliberate indifference occurs where conscious disregard is displayed for the consequences of actions, not just simple or even heightened negligence. To prove deliberate indifference, a plaintiff must demonstrate that: (1) a policymaker knows to a moral certainty that his or her employees will confront a given situation; (2) the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) the wrong choice by the municipality employee will frequently cause the deprivation of a citizen's

constitutional rights.

<u>Knicrumah v. Albany City Sch. Dist.</u>, No. 01-CV-419, 2003 WL 168533 (N.D.N.Y. Jan. 16, 2003) (internal quotations omitted) (citing <u>Walker v. City of New York</u>, 974 F.2d 293, 297-98 (2d Cir. 1992)); <u>see also</u> <u>Young v. County of Fulton</u>, 160 F.3d 899, 903-04 (2d Cir. 1998).

This Court has found that neither Greene nor Freedman violated Mislin's rights under the Fourth or Fourteenth Amendments.  As such, a finding of liability as to the School District for failure to hire, retain, train or supervise is precluded since there was no constitutional violation or injury.  The School Board's Motion for Summary Judgment on this claim will therefore be granted.

### 3.   Discrimination Claims against the School District, the Board and Freedman

Plaintiffs' third cause of action alleges that the School District, the Board and Freedman discriminated against Mislin in violation of Title VI.  Plaintiffs' fourth cause of action alleges that the School District and the Board discriminated against Plaintiff in violation of § 1981.

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.  To establish a claim under Title VI, a plaintiff must show: (1) that the entity involved engaged in racial or national origin discrimination; (2) the entity involved is receiving federal financial aid; and (3) plaintiff was an entitled beneficiary of the

program or activity receiving the aid.  Babiker v. Ross Univ. Sch. of Med., No. 98 CIV 1429

THK, 2000 WL 666342, at * 4 (S.D.N.Y. May 19, 2000).

In turn, 42 U.S.C. § 1981(a) provides the following:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall
have the same right in every State and Territory to make and
enforce contracts, to sue, be parties, give evidence, and to the
full and equal benefit of all laws and proceedings for the
security of persons and property as is enjoyed by white
citizens, and shall be subject to like punishment, pains,
penalties, taxes, licenses, and exactions of every kind, and to
no other.

To establish a § 1981 claim, a plaintiff must demonstrate (1) that he is a member

of a racial minority; (2) that there was an intent to discriminate on the basis of race by the

defendants; and (3) that the discrimination concerned one or more of the activities

enumerated in the statute.  See Brown v. City of Oneonta, NY, 221 F.3d 329, 339 (2d Cir.

2000); Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1995)

(per curiam).  Reverse discrimination is a valid ground for § 1981 relief.  See McDonald v.

Santa Fe Trail Transp. Co., 427 U.S. 273, 286-87, 96 S.Ct. 2574, 2582, 49 L.Ed.2d 493

(1976) (§ 1981 protects "all persons" from racial discrimination).

When this case began, the thrust of Plaintiffs' discrimination claims under the

Fourteenth Amendment, Title VI and § 1981 was their contention that Mislin was the victim

of reverse-discrimination.  See, e.g., Amended Complaint, ¶ 31 (describing Plaintiffs'

Fourteenth Amendment claim as "aris[ing] from the intentional reverse race discrimination

and deliberate indifference to the racially hostile environment perpetrated against Mislin,

Jr."); ¶ 38 (alleging Title VI violation because Mislin was subjected to the investigation and found to be guilty of harassment to appease the African-American complainant); ¶ 43 (alleging race discrimination under § 1981).  It appeared from Plaintiffs' response papers that they abandoned their race-based claims in favor of a selective treatment theory.  See Mislin, 2006 WL 1144618, at *1.  However, in their supplemental memorandum of law, Plaintiffs express their desire to pursue their race-based claims.  Plaintiffs, however, have presented not one piece of evidence demonstrating that Mislin was the victim of race-based or reverse racial discrimination.

Plaintiffs seek to sustain their claims on the unsupported allegation that the defendants instituted the investigation against Mislin "to find *some Caucasian student* guilty as charged and discipline him harshly in order to quiet Boykins' (and the public's) discontent."  (Plaintiffs' Supplemental Memorandum of Law, p. 3 (emphasis in original).)  This is no more than a restatement of the allegation contained in Plaintiffs' Amended Complaint.[22]  Since this litigation is well-beyond the pleading stage, Plaintiffs are obligated to present *evidence* in support of their allegations.  See FED. R. CIV. P. 56(e) ("an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"); Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (conclusory allegations and unsubstantiated speculation cannot defeat summary judgment).  They have not done so.

---

[22]Compare Amended Complaint, ¶ 38 ("Upon information and belief, the racially biased actions of TONAWANDA, the BOARD and/or its agents and the conclusion of its investigation, were based, at least in part, on the desire to appease and quiet the racial allegations of the African-American student at the expense and the deliberate indifference of the rights of the Caucasian MISLIN, JR.)

Nothing in the evidentiary record that this Court has been directed to demonstrates or suggests that Mislin was included in the investigation because he is Caucasian. Plaintiffs assert that Mislin had already been disciplined for the conduct alleged in Boykins' complaint, but this ignores the fact that Boykins' complaint to the Board expanded beyond isolated incidents of conduct and included allegations that administrators and teachers were not appropriately responding to incidents of harassment.   Boykins specifically identified Mislin in the complaint as one of the harassers who had "gotten away with" racial and homosexual harassment.   In light of the undisputed fact that Mislin was specifically named in Boykins' complaint, it strikes this Court as grand speculation that the defendants decided to investigate Mislin, not because he was identified in Boykins' complaint, but rather because he was Caucasian.   In the absence of any evidence in the record supporting this allegation, the defendants are entitled to summary judgment on Plaintiffs' Title VI and § 1981 claims.[23]

## C.    State Law Causes of Action

Having disposed of all federal claims falling within this Court's original jurisdiction, this Court finds it most appropriate to decline to exercise supplemental jurisdiction.  See 28 U.S.C. § 1367(c)(3).  Plaintiffs' only remaining claims are state law causes of action alleging (1) the denial of Mislin's right to obtain an education in violation of N.Y. Exec. Law § 291, (2) the negligent hiring and training of Freedman, (3) negligent supervision of Freedman, (4) negligent retention and continued detention of Freedman to conduct the

---

[23]This Court notes that at oral argument, Plaintiffs' counsel conceded that their race-based claims were "not the strongest claims that we can present."  (Tr. at 32.)

investigation, (5) negligent pursuit and manner of investigation, and (6) wrongful death.

The United States Supreme Court has instructed that courts should ordinarily decline to exercise supplemental jurisdiction in the absence of federal claims. See Carnegie-Mellon Univ. v.  Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (noting that in the usual case where all federal claims are eliminated before trial, the relevant factors informing the decision of whether to exercise supplemental jurisdiction will "point towards declining to exercise jurisdiction over the remaining state-law claims"); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

The Second Circuit shares this view: where "federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003); see also Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial the state claims should be dismissed as well."); Powell v. Gardner, 891 F.2d 1039, 1047 (2d Cir. 1989) ("in light of proper dismissal of the § 1983 claim against the County, the district court should have declined to exercise pendent jurisdiction over Powell's state-law claims against the County").

Moreover, comity suggests that this case is better litigated in the New York State Supreme Court, where the conduct of state actors can be resolved by the state court under

state law.  See Saggio v. Sprady, No. CV-04-777, 2007 WL 528632, at *8 (E.D.N.Y. Feb. 16, 2007) (declining to exercise supplemental jurisdiction where "the case involves the conduct of state actors under state law").  This is particularly true in this case, which involves local interaction between public school officials, students and their parents.  Cf. Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (noting that States and school officials have the "comprehensive authority . . . consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools"); Brown v. Bd. of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) ("education is perhaps the most important function of state and local governments").  In the absence of federal claims or issues implicating federal policies, this Court finds that this dispute is best left to the state court.

Plaintiffs' state court claims will be timely so long as they file them within at least 30 days[24] from the date of this decision.  See 28 U.S.C. § 1367(d);[25] see also Jeffers v. Doe, No. 9:99 CV 335, 2005 WL 2240686, at *7 (N.D.N.Y. Sep. 13, 2005) (noting that § 1367(d) protects a plaintiff's ability to bring state claims in state court if the federal court dismisses those claims after the expiration of the applicable statute of limitations period).  Twenty-eight U.S.C. § 1367(d) contains this tolling provision "[t]o prevent the limitations period on

---

[24]It appears that Plaintiffs may have as long as six months to file their claims under N.Y. C.P.L.R. § 205(a), which depending on the nature of the dismissal, permits a plaintiff to recommence an otherwise timely-filed dismissed suit within six months.

[25]Twenty-eight U.S.C. § 1367(d) provides as follows:

> The period of limitation for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

such supplemental claims from expiring while the plaintiff was fruitlessly pursuing them in federal court" and to "promote[ ] fair and efficient operation of the federal courts." Jinks v. Richland County, S.C., 538 U.S. 456, 459, 463, 123 S.Ct. 1667, 1669, 1671, 155 L.Ed.2d 631 (2003) (upholding the constitutionality of § 1367(d)).

Accordingly, this Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and will instead dismiss them without prejudice pursuant to 28 U.S.C. § 1367(c)(3). See Mayer v. Oil Field Sys. Corp., 620 F.Supp. 76, 77-78 (S.D.N.Y. 1985) ("The exercise of [supplemental] jurisdiction . . . where the federal claims have been dismissed on summary judgment before trial would be inappropriate absent exceptional circumstances. Since [N.Y. C.P.L.R. § 205(a)] allow[s] a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations, [the plaintiff] will not be unduly prejudiced by the dismissal of her state law claims.").

## IV.  CONCLUSION

For the reasons discussed above, the defendants' Motions for Summary Judgment are granted as to the federal claims. Further, this Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law causes of action.

## V.  ORDERS

IT HEREBY IS ORDERED, that the Tonawanda Defendants' Motion for Summary Judgment (Docket No. 100) is GRANTED as to the federal claims.

FURTHER, that Freedman's Motion for Summary Judgment (Docket No. 104) is GRANTED as to the federal claims.

41

FURTHER, that this Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, which are hereby DISMISSED pursuant to 28 U.S.C. § 1367(c)(3) without prejudice.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.


Dated:   March 28, 2007
         Buffalo, New York

                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge